1  Meiram Bendat (Cal. Bar No. 198884)
   PSYCH-APPEAL, INC.
2  8560 West Sunset Boulevard, Suite 500
   West Hollywood, California  90069
3  Tel: (310) 598-3690, x.101
   Fax: (310) 564-0040
4  mbendat@psych-appeal.com
5
   Daniel L. Berger (to be admitted pro hac vice)    Jason S. Cowart (to be admitted pro hac vice)
6  Kyle J. McGee (to be admitted pro hac vice)       ZUCKERMAN SPAEDER LLP
   Rebecca A. Musarra (Cal. Bar No. 291250)          1185 Avenue of the Americas, 31st Floor
7  GRANT & EISENHOFER P.A.                           New York, New York  10036
   485 Lexington Avenue                              Tel: (212) 704-9600
8  New York, New York  10017                         Fax: (212) 704-4256
   Tel: (646) 722-8500                               jcowart@zuckerman.com
9  Fax: (646) 722-8501
   dberger@gelaw.com
10 kmcgee@gelaw.com
   rmusarra@gelaw.com
11

12

*Attorneys for Plaintiffs and the Proposed Class*

13

14
## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
15
## SAN JOSE DIVISION

16 | CHARLES DES ROCHES, on his own behalf and          )
17 | on behalf of his beneficiary son, R.D., and all others )
   | similarly situated, and SYLVIA MEYER, on her        )
18 | own behalf and all others similarly situated,        )      Case No. __:16-cv-____
   |                                                      )
19 |                          Plaintiffs,                 )
   |                                                      )
20 |              v.                                      )      **CLASS ACTION COMPLAINT**
   |                                                      )
21 | CALIFORNIA PHYSICIANS' SERVICE d/b/a                  )
   | BLUE SHIELD OF CALIFORNIA; HUMAN                      )
22 | AFFAIRS INTERNATIONAL OF CALIFORNIA;                  )
   | and MAGELLAN HEALTH SERVICES OF                       )
23 | CALIFORNIA, INC.-EMPLOYER SERVICES                    )
   |                                                      )
24 |                          Defendants.                 )
   |                                                      )
25 |                                                      )
   |_____        )
26

27

28

1    Plaintiffs Charles Des Roches and Sylvia Meyer ("Plaintiffs"), by and through their

2  undersigned counsel, based on personal knowledge as to themselves and on information and

3  belief, and investigation of counsel, as to all other matters, individually and on behalf of all

4  others similarly situated, allege as follows:

5                                     **INTRODUCTION**

6    1.    According to the National Institute of Mental Health ("NIMH"), an estimated 26

7  percent of American adults suffer from some type of mental health condition each year, with

8  six percent suffering from a severe mental health condition such as schizophrenia or major

9  depression.  About 11 percent of adolescents have a depressive disorder by age 18.  The

10  seriousness of this problem is highlighted by the fact that suicide consistently ranks as the third

11  leading cause of death for young people aged 15-24.  Individuals with borderline personality

12  disorder, who constitute 6 percent of patients in primary care settings, 10 percent of patients in

13  outpatient clinics, and 20 percent of psychiatric inpatients, also face a significant risk of

14  suicide.

15    2.    According to the Substance Abuse and Mental Health Services Administration

16  ("SAMHSA"), an estimated nine percent of Americans twelve or older were classified with

17  substance use disorder in 2010.  Between 2007 and 2010, about 38 percent of Americans

18  twelve or older who needed substance abuse treatment did not receive treatment because they

19  lacked insurance coverage, and could not afford the cost of treatment without such coverage.

20  The World Health Organization ("WHO") reports that mental health and substance use

21  disorders are among the leading causes of disability in the United States, and the Centers for

22  Disease Control and Prevention ("CDC") reports that 25 percent of all years of life lost to

23  disability and premature mortality are a result of mental illness.  When substance use disorders

24  are inadequately treated, they complicate care for co-occurring mental health disorders and

25  medical conditions.

26    3.    Despite these alarming statistics, Defendants California Physicians' Service

27  d/b/a Blue Shield of California ("Blue Shield"), Human Affairs International of California

28  ("HAI-CA"), and Magellan Health Services of California, Inc.-Employer Services ("MHSC,"

2

and together with HAI-CA, "Magellan") (collectively, "Defendants"), which adjudicate mental health and substance abuse claims for thousands of California residents, are violating legal and fiduciary duties they owe to health insurance plan participants and beneficiaries by improperly restricting the scope of their insurance coverage for residential and intensive outpatient mental health and substance abuse treatment. These restrictions are inconsistent with the terms of the relevant insurance plans and generally accepted professional standards in the mental health and substance abuse disorder treatment community. They were also adopted and applied by Defendants in breach of Defendants' fiduciary duties.

4.     Because they have been, and are likely to continue to be, harmed by Defendants' misconduct, Plaintiffs bring this complaint on behalf of themselves and all others similarly situated, to seek declaratory, injunctive, and other equitable relief.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

5.     Plaintiffs are each insured by a health insurance plan that is sponsored by their employer and governed by the Employee Retirement Income Security Act of 1974 ("ERISA") (the "Plans").

6.     The Plans are fully insured.

7.     Blue Shield is responsible both for paying claims under the Plans and for administering the Plans.

8.     Plaintiffs' Plans cover in- and out-of-network treatments for illnesses and injuries as well as for mental illnesses and substance use disorders described in the *Diagnostic and Statistical Manual, Fifth Edition* ("DSM-5") of the American Psychiatric Association. As such, Plaintiffs' Plans cover residential and intensive outpatient treatment for mental illnesses and substance abuse disorders.

9.     To be entitled to insurance benefits paying for such treatment, Plaintiffs' Plans require that the treatment be "medically necessary," as defined by generally accepted professional standards.

10. Plaintiffs' Plans have delegated responsibility for adjudicating mental health and substance abuse claims to a "Mental Health Service Administrator," as referred to in Plan documents.

11. Blue Shield selected Magellan to serve as the MHSA for Plaintiffs' Plans.

12. Blue Shield retains "the right to review all claims to determine if a service or supply is medically necessary," including mental health and substance abuse claims.

13. Pursuant to this delegation, Magellan has adopted, and Blue Shield has approved the adoption of, Medical Necessity Criteria Guidelines ("MNCG") developed by Magellan's parent company, Magellan Health, Inc.

14. Magellan's claims representatives use the MNCGs to adjudicate mental health and substance abuse claims.

15. The sponsors of Plaintiffs' Plans, their employers, have no role in the creation, promulgation, or content of Defendants' guidelines or in the decision to approve or deny any claim.

16. The MNCGs distinguish eight different "levels of care": (1) hospitalization; (2) subacute hospitalization; (3) 23-hour observation; (4) residential treatment; (5) supervised living; (6) partial hospitalization; (7) intensive outpatient programs; and (8) outpatient treatment. Magellan defines these levels of care purportedly to ensure that "optimal, high-quality care" may be delivered "in the least-intensive, least-restrictive setting possible," and imposes specific criteria that mental health and substance abuse claimants must satisfy in order to obtain the treatment and level of care prescribed by their healthcare providers.

17. The MNCGs under which mental health and substance abuse claims are adjudicated provide that coverage for residential treatment will be authorized only where the claimant has had "recent (*i.e.*, in the past 3 months), appropriate professional intervention at a less intensive level of care." Defendants have thus adopted a "fail-first" criterion in their MNCGs.

18. Fail-first protocols are inconsistent with generally accepted professional standards in the mental health and substance abuse disorder treatment community, as shown below.

19. Moreover, the MNCGs condition coverage for residential treatment on whether the claimant can prove a "clear and reasonable inference of serious, imminent physical harm to self or others" absent residential treatment.

20. However, under generally accepted professional standards in the mental health and substance abuse disorder treatment community, as shown in more detail below, the presence of such a risk of harm typically necessitates the highest level of treatment, *i.e.*, hospitalization.

21. The MNCGs also improperly condition residential substance use rehabilitation on a "demonstrat[ion of] motivation to manage symptoms or make behavioral change."

22. Under generally accepted professional standards in the mental health and substance abuse disorder treatment community, however, lack of motivation in adolescents is a factor that, in particular, warrants placement at the residential level of care. Thus, this requirement, too, is inconsistent with generally accepted professional standards.

23. Next, the MNCGs ignore a host of residential placement criteria enumerated by national medical specialty organizations such as the American Association of Child and Adolescent Psychiatry ("AACAP") and the American Society for Addiction Medicine ("ASAM"), including the necessity of erring on the side of caution and approving levels of care consistent with the judgments of the treating mental health professionals based on the professionals' direct access to their patients, in the absence of compelling evidence that such levels of care are unwarranted.

24. Similarly, the MNCGs deviate from ASAM standards by conditioning residential rehabilitation treatment on a "*severely*" dysfunctional living environment, which is a far more restrictive condition than ASAM provides. The ASAM standards call for consideration of a large variety of familial and environmental factors, and are not consistent

CLASS ACTION COMPLAINT

with denying care where a patient's living environment is demonstrably "dysfunctional" but not "severely dysfunctional."

25.     The MNCGs are similarly problematic with respect to intensive outpatient treatment for substance abuse disorders.  Just as with the residential treatment admission criteria, the intensive outpatient treatment guidelines impose an improper "motivation" requirement.

26.     In addition, the intensive outpatient treatment guidelines require that the treatment plan for the patient is "reasonably expected to bring about *significant* improvement."

27.     This requirement for a demonstration of "significant" improvement has no basis in generally accepted medical practices.  Indeed, the American Association of Community Psychiatrists ("AACP") explains that the treatment should be considered medically necessary if the intervention would cause any *one* of the following results:  (a) prevent deterioration; (b) alleviate symptoms; (c) improve level of functioning; or (d) assist in restoring normal development in a child.

28.     Likewise, the Centers for Medicare & Medicaid Services has indicated that even for inpatient psychiatric hospital services, providers are only required to show that the treatment would "reasonably [be] expected to improve the patient's condition . . . ."

29.     Accordingly, Defendants systematically deny mental health and substance abuse claimants the residential and intensive outpatient treatment they need unless such claimants can meet a set of requirements entirely different from, and often conflicting with, the generally accepted professional standards for treatment.

30.     Although the Plans expressly require Defendants to apply generally accepted professional standards in making mental health and substance use claims determinations, Defendants have imposed a set of internally developed criteria—the MNCGs—that are far more restrictive than such standards, in order to minimize the number of claims accepted and thereby maximize their own profits.

31.     In light of their central role in the mental health and substance abuse claim adjudication process, and the discretionary authority that they exercise, Defendants are ERISA fiduciaries, as defined by 29 U.S.C. § 1104(a).

32.     As such, they are legally required to discharge their duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the Plans.  They must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the Plans they administer, so long as such terms are consistent with ERISA.

33.     As fiduciaries, Defendants owe a duty of loyalty and care to Plan participants and beneficiaries, including Plaintiffs.  They must also refrain from any conduct that violates state or federal law.

34.     Defendants suffer from inherent conflicts of interest in their role as mental health and substance abuse claims administrators.

35.     Plaintiffs' Plans are "fully-insured," meaning that health care benefits are paid by the insurance carrier, rather than the employer.

36.     In the case of Plaintiffs' Plans, either Blue Shield or Magellan is responsible for paying costs associated with mental health and substance abuse claims.

37.     Whichever is the case, Defendants benefit when Magellan denies claims.

38.     To the extent mental health and substance abuse claims are paid by Blue Shield, every mental health and substance abuse claim denied by Magellan allows Blue Shield to save money and artificially increases its profits, while currying the favor of Blue Shield toward Magellan in order to strengthen their business relationship.

39.     Blue Shield is an important customer of Magellan's. It purchased $20 million of Magellan's shares when it entered into its contract with Magellan in 2011.  And its customers account for more than $180 million a year in net revenue.  In fact, Blue Shield generated in excess of ten percent of all of Magellan's net revenues in the commercial segment in each of the years ending December 31, 2012, December 31, 2013, and December 31, 2015.

40.     Magellan's performance, and the costs it causes Blue Shield to incur, are particularly salient considerations for Magellan because beginning January 1, 2018, Blue Shield may terminate its contract with Magellan without cause.

41.     In addition, pursuant to an Alliance Agreement executed in 2011, Blue Shield has agreed to allow Magellan to offer additional services in the event Blue Shield decides to replace an existing service provider or introduce a new health insurance product.

42.     Consequently, it is in Magellan's interest to reduce the costs Blue Shield incurs by denying mental health and substance abuse treatment claims.

43.     To the extent Magellan itself pays costs associated with mental health and substance abuse claims, it directly benefits from the denial of such claims.

44.     As acknowledged in a filing with the U.S. Securities and Exchange Commission by Magellan's parent, Magellan Health Inc., in this type of "risk-based" arrangement, Magellan assumes responsibility for costs of treatment in exchange for a fixed fee.  Therefore, if the costs associated with paying claims exceed the fixed fee Magellan receives from Blue Shield, its profitability would be negatively affected.

45.     Against this backdrop, Magellan has violated its fiduciary duties, as detailed herein.  Although Magellan asserts in its guidelines and communications with insureds that its MNCGs are consistent with generally accepted professional standards, and that it applies generally accepted professional standards in the mental health and substance abuse disorder treatment community in making mental health and substance abuse claim determinations, neither is true.

46.     Generally accepted professional standards related to mental health and substance abuse treatments are promulgated by the American Psychiatric Association ("APA"), the American Association of Child and Adolescent Psychiatry (AACAP, as defined above), the American Association of Community Psychiatrists (AACP, as defined above), the American Society for Addiction Medicine (ASAM, as defined above), the Association for Ambulatory Behavioral Healthcare ("AABH"), and a body of published, peer-reviewed research.

47.     Generally, these standards identify a host of criteria as being relevant to determining which kind of treatment, and with what conditions, is the appropriate level of care for any particular patient, recognize that residential and intensive outpatient treatment levels are less restrictive than hospitalization, and call for residential treatment (but typically not hospitalization) when the patient's condition may not involve any risk of harm to self or others.

48.     Magellan's MNCGs are much more restrictive than the generally accepted professional standards in the mental health and substance abuse disorder treatment community.

49.     As detailed herein, whereas Magellan's guidelines regarding admission to residential care impose (1) an improper "fail-first" criterion, (2) a "serious, imminent" risk of harm standard proper only for hospitalization claims, (3) an improper "motivation" condition, (4) a burden-shifting condition that favors denial of coverage for treatment recommended by treating mental health and substance abuse professionals, and (5) an elevated burden on the claimant with respect to factors demonstrating a dysfunctional living environment or failure to respond to less-intensive treatment regimens, such restrictions on residential treatment are not found in any of the generally accepted professional standards or, for that matter, in any of the Plaintiffs' Plans.

50.     Similarly, Magellan's guidelines regarding continued stay in intensive outpatient treatment contravene generally accepted professional standards and therefore Plaintiffs' Plans, because they (1) impose an improper "motivation" condition and (2) require that the treatment plan is reasonably expected to bring about "significant improvement"(rather than reasonable improvement, prevention of deterioration, etc.) in the patient's substance abuse disorder.

51.     Plaintiffs' Plans provide mental health and substance abuse coverage, but exclude coverage where the treatment is inconsistent with generally accepted professional standards.

52.     Thus, in developing its guidelines, Magellan had a fiduciary duty to Plaintiffs (and to all other members of Plans administered by Magellan) to promulgate and apply guidelines that are consistent with Plaintiffs' Plans and generally accepted professional standards.

53.     Magellan breached this duty by supplanting generally accepted treatment standards in the mental health and substance abuse field with standards that promote the self-serving, cost-cutting preferences of Magellan and Blue Shield.

54.     By adopting guidelines that are inconsistent with, and much more restrictive than, those that are generally accepted in the relevant professional community, Magellan breached its fiduciary duty to act solely in the interests of participants and beneficiaries for the "exclusive purpose" of providing benefits with reasonable "care, skill, prudence, and diligence" and in accordance with Plaintiffs' Plans.

55.     Magellan also violated its fiduciary obligations under ERISA by improperly denying residential and intensive outpatient treatment claims that were covered by Plaintiffs' Plans.  These claims would have been covered based on the terms of Plaintiffs' Plans and generally accepted treatment standards, but were denied as a result of Magellan's improper adoption and application of restrictive benefit determination guidelines.

56.     To remedy Magellan's breach of fiduciary duty and other ERISA violations, Plaintiffs bring class claims against Magellan under 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3)(A), and 1132(a)(3)(B).  Through this action, Plaintiffs seek appropriate declaratory, equitable, and injunctive relief under ERISA to compel Magellan to change its policies and practices so as to comply with its fiduciary obligations and to make benefit determinations which are consistent with Plaintiffs' Plans, generally accepted professional standards in the mental health and substance abuse disorder treatment community, and applicable law.

57.     Blue Shield is also in breach of its fiduciary obligations due to its role in selecting Magellan as claims administrator, ratifying Magellan's deficient benefits determination and claims adjudication processes (including the restrictive MNCGs), and its failure to review and/or correct Magellan's deficient benefits determination and claims adjudication processes (including the MNCGs).

58.     Similarly, Blue Shield breached its fiduciary obligations under ERISA by improperly denying residential and intensive outpatient treatment claims that were covered by Plaintiffs' Plans.  These claims would have been covered based on the terms of Plaintiffs' Plans

1   and generally accepted treatment standards, but were denied as a result of Blue Shield's

2   improper adoption and ratification of Magellan's restrictive benefit determination guidelines

3   and claims adjudication process.

4        59.     To remedy Blue Shield's breach of fiduciary duty and other ERISA violations,

5   Plaintiffs bring class claims against Blue Shield under 29 U.S.C. §§ 1132(a)(1)(B),

6   1132(a)(3)(A), and 1132(a)(3)(B).  Through this action, Plaintiffs seek appropriate declaratory,

7   equitable, and injunctive relief under ERISA to compel Blue Shield to change its policies and

8   practices so as to comply with its fiduciary obligations and to make benefit determinations

9   which are consistent with Plaintiffs' Plans, generally accepted professional standards in the

10  mental health and substance abuse disorder treatment community, and applicable law.

11  **JURISDICTION AND VENUE**

12       60.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

13  § 1331.

14       61.     This Court has personal jurisdiction over Defendants and this District is the

15  proper venue because Defendants conduct operations in this District, regularly communicate

16  with insureds residing in this District, and maintain offices in this District.

17  **PARTIES**

18       62.     Plaintiff Charles Des Roches, a resident of Salinas, California, brings this action

19  on behalf of himself, his minor son ("R.D."), and all others similarly situated.  Mr. Des Roches

20  is insured under a Blue Shield of California health plan through his employer.

21       63.     Plaintiff Sylvia Meyer, a resident of California, brings this action on behalf of

22  herself and all others similarly situated.  Ms. Meyer is insured under a Blue Shield of California

23  health plan through her employer.

24       64.     Defendant Blue Shield, a California company with its principal place of business

25  in San Francisco, California, is an independent member of the BlueCross BlueShield

26  Association.  Its annual revenues exceed $13 billion dollars.  Blue Shield lost its tax-exempt,

27  not-for-profit status in 2014 following an audit by the California Franchise Tax Board.

28

65.     Defendant HAI-CA is a California subsidiary of Magellan Healthcare, Inc., which is a subsidiary of Magellan Health, Inc.

66.     Defendant MHSC is a corporation registered in California with its principal place of business in Columbia, Maryland.  MHSC is a subsidiary of Magellan Pharmacy Services, Inc., which itself is a subsidiary of Magellan Health, Inc.

**MAGELLAN'S MEDICAL NECESSITY CRITERIA GUIDELINES**

67.     Blue Shield has selected Magellan as the Mental Health Service Administrator, or MHSA, responsible for the determination of Plan coverage for mental health and substance abuse treatment claims.

68.     According to the terms of the Plans, Blue Shield retains "the right to review all claims to determine if a service or supply is medically necessary," including mental health and substance abuse claims.

69.     Magellan's MNCGs guide its adjudication of all mental health and substance abuse treatment claims under plans issued by Blue Shield, including Plaintiffs' Plans.

70.     Magellan's MNCGs are purportedly designed to ensure that mental health and substance abuse treatment occurs "at the most appropriate, least restrictive level of care necessary to provide safe and effective treatment and meet the individual patient's biopsychosocial needs."

71.     Magellan's MNCGs distinguish eight levels of care: (1) hospitalization; (2) subacute hospitalization; (3) 23-hour observation; (4) residential treatment; (5) supervised living; (6) partial hospitalization; (7) intensive outpatient programs; and (8) outpatient treatment.  Magellan defines these levels of care purportedly to ensure that "optimal, high-quality care" may be delivered "in the least-intensive, least-restrictive setting possible," and imposes specific criteria that mental health and substance abuse claimants must satisfy in order to obtain the treatment and level of care prescribed by their healthcare providers.

72.     Magellan defines "medical necessity" in the following manner:  "*Services by a provider to identify or treat an illness that has been diagnosed or suspected.  The services are:* (1) consistent with: (a) the diagnosis and treatment of a condition; and (b) the standards of good

medical practice; (2) required for other than convenience; and (3) the most appropriate supply or level of service. *When applied to inpatient care, the term means: the needed care can only be safely given on an inpatient basis.*"

73.     Magellan claims that "[e]ach criteria set, within each level of care category … is a more detailed elaboration of the above definition for the purposes of establishing medical necessity for these health care services.  Each set is characterized by admission and continued stay criteria.  The admission criteria are further delineated by severity of need and intensity and quality of service.  Particular rules in each criteria set apply in guiding a provider or reviewer to a medically necessary level of care ….  For admission, both the severity of need and the intensity and quality of service criteria must be met.  The continued stay of a patient at a particular level of care requires the continued stay criteria to be met (Note: this often requires that the admission criteria are still fulfilled).  Specific rules for the admission and continued stay groupings are noted within the criteria sets."

## A.     RESIDENTIAL REHABILITATION TREATMENT CONDITIONS

74.     To meet the "severity of need" requirement and thus merit admission for residential rehabilitation treatment for substance abuse disorders in children and adolescents, Magellan's 2015 MNCGs require satisfaction of the following conditions:

I.     Admission – Severity of Need

Criteria A, B, C, D, E, F, and G must be met to satisfy the criteria for severity of need.

A.     The patient has a substance-related disorder as defined by DSM-5 that is amenable to active behavioral health treatment.

B.     The patient has sufficient cognitive ability at this time to benefit from admission to a residential treatment program.

C.     The patient exhibits a pattern of severe substance abuse/dependency as evidenced by significant impairment in social, familial, scholastic or occupational functioning.

D.     **One of the following must be met to satisfy this criterion:**

**1)     despite recent (*i.e.*, the past 3 months) appropriate, professional intervention at a less-intensive level of care the**

13

**patient is continually unable to maintain abstinence and recovery;** *or*

2) **the patient is residing in a severely dysfunctional living environment which would undermine effective rehabilitation treatment at a less-intense level of care and alternative living situations are not available or clinically appropriate, or**

3) **there is evidence for, or clear and reasonable inference of serious, imminent physical harm to self or others directly attributable to the continued abuse of substances, which would prohibit treatment in a less intensive setting, or**

4) **there is clinical evidence that the patient is not likely to respond at a less intensive level of care.**

E. The patient's condition is appropriate for residential treatment, as there is not a need for detoxification treatment at an inpatient hospital level of care. The patient does not have significant co-morbid condition(s).

F. **The patient demonstrates motivation to manage symptoms or make behavioral change.**

G. The patient is capable of developing skills to manage symptoms or make behavioral change.

75. Magellan's 2015 MNCGs specify further criteria that must be satisfied to merit continuing residential rehabilitation treatment for substance abuse disorders in children and adolescents:

III. Continued Stay

Criteria A, B, C, D, E, and F must be met to satisfy the criteria for continued stay.

A. Despite reasonable therapeutic efforts, clinical evidence indicates at least one of the following:

1) the persistence of problems that caused the admission to a degree that continues to meet the admission criteria (both severity of need and intensity of service needs), *or*

2) the emergence of additional problems that meet the admission criteria (both severity of need and intensity of service needs), *or*

3) that disposition planning and/or attempts at therapeutic re-entry into the community have resulted in, or would result in, exacerbation of the substance-related disorder to the degree that would necessitate continued residential treatment. Subjective opinions without objective clinical information or evidence are NOT sufficient to meet severity of need based on justifying the expectation that there would be a decompensation.

14

B.  **The current or revised treatment plan can be reasonably expected to bring about significant improvement in the problem(s) meeting criterion IIIA**, and the patient's progress is documented by the provider at least three times per week.  This plan receives regular review and revision that includes ongoing plans for timely access to treatment resources that will meet the patient's post-residential treatment needs.

C.  The individual plan of active treatment includes regular family and/or support system involvement unless there is an identified, valid reason why such a plan is not clinically appropriate or feasible.

D.  **The patient has the capability of developing skills to manage symptoms or make behavioral change and demonstrates motivation for change**, as evidenced by attending treatment sessions, completing therapeutic tasks, and adhering to a medication regimen or other requirements of treatment.

E.  A discharge plan is formulated that is directly linked to the behaviors and/or symptoms that resulted in admission, and begins to identify appropriate post-residential treatment resources.

F.  All applicable elements in Admission Intensity and Quality of Service criteria are applied as related to assessment and treatment, if clinically relevant and appropriate.

76.  Although Magellan states that these criteria reflect merely "a more detailed elaboration" of the definition of "medical necessity," they are substantially more restrictive than generally accepted professional standards.

77.  Condition I.D(1) is a "fail-first" criterion.  Fail-first conditions are inconsistent with generally accepted professional standards in the substance abuse treatment field.

78.  As the National Center on Addiction and Substance Abuse reports, "There is no clinical evidence to support the use of fail-first policies in addiction treatment.  Clinical practice guidelines call for a comprehensive assessment of each patient to determine the appropriate therapies and level of care given the severity of the patient's addiction and the presence of co-occurring health conditions and other social/environmental factors.  **Requiring a patient to fail treatment at one level of care or to fail one specific therapy before starting clinically indicated care does not accord with these guidelines."**

79.  These statements are strongly supported by clinical research.  *See, e.g.*, MEE-LEE, D., ET AL., THE ASAM CRITERIA: TREATMENT CRITERIA FOR ADDICTIVE, SUBSTANCE-

15

RELATED, AND CO-OCCURRING CONDITIONS (3d ed. 2013); AMERICAN PSYCHIATRIC ASSOCIATION, PRACTICE GUIDELINE FOR THE TREATMENT OF PATIENTS WITH SUBSTANCE USE DISORDERS (2d ed. 2010).  As the ASAM observes, "fail-first" criteria "ha[ve] been used by some reimbursement or managed care organizations as a prerequisite for approving admission to a more intensive level of care (for example, 'failure' in outpatient treatment as a prerequisite for admission to inpatient treatment).  **In fact, the requirement that a person 'fail first' in outpatient treatment before inpatient treatment is approved is no more rational than treating every patient in an inpatient program or using a fixed length of stay for all.**  It also does not recognize the obvious parallels between addictive disorders and other chronic diseases, such as diabetes or hypertension.  For example, failure of outpatient treatment is not a prerequisite for acute inpatient admission for diabetic ketoacidosis or hypertensive crisis.  **A 'treatment failure' approach potentially puts the patient at risk because it delays a more appropriate level of treatment,** and potentially increases health care costs, if restricting the appropriate level of treatment allows the addictive disorder to progress."

80.     Condition I.D(3) requires "evidence for, or clear and reasonable inference of **serious, imminent physical harm to self or others** directly attributable to the continued abuse of substances, which would prohibit treatment in a less-intensive setting."  Under generally accepted professional standards, such a criterion is inappropriate.

81.     The presence of such a risk would require the highest level of treatment, *i.e.*, hospitalization, rather than residential treatment.  ASAM's level of care analysis requires that if an adolescent is at "severe risk of harm"—or even "moderate risk of harm needing high-intensity 24-hour monitoring or treatment, or secure placement, for safety"—hospitalization is required.

82.     Condition I.D(3) is also inconsistent with California law.  *See* California Welfare & Institutions Code § 5585.50, *et seq.*  Under that regulation, a minor suffering from a mental disorder and representing a danger to self or others may be taken into custody and placed in a State-approved facility for treatment and observation.

83.     Condition I.F requires a "demonstrat[ion of] motivation to manage symptoms or make behavioral change."  (Condition III.D imposes substantially the same requirement for continued stay.)  This is the *antithesis* of the generally accepted professional standard for adolescent substance abuse treatment with respect to lack of motivation.  This criterion is improper and inconsistent with generally accepted professional standards because lack of motivation in adolescents suggests a *need for* residential rehabilitation treatment.  That Defendants use this criterion to exclude such treatment and deny otherwise valid residential treatment claims is demonstrative of their disregard for their fiduciary duties.

84.     According to the ASAM standards, adolescents suffering from substance use disorders often lack "readiness to change" and require motivational intervention in a residential rehabilitation facility for precisely that reason.  As ASAM notes, where an adolescent "has limited insight into and little awareness of the need for continuing care or the existence of his or her substance use or mental health problem and need for treatment"; or has "marked difficulty in understanding the relationship between his or her substance use, addiction, mental health, or life problems and his or her impaired coping skills and level of functioning, often blaming others for his or her addiction problem"; or "demonstrates passive or active opposition to addressing the severity of his or her mental health problem or addiction, or does not recognize the need for such treatment"; among other examples, the adolescent requires intensive residential rehabilitation treatment.

85.     Next, Magellan's MNCGs ignore the AACAP's and ASAM's key standard that insurers (and professionals) must approve levels of care consistent with treating mental health professionals' judgments based on direct access to their patients in the absence of compelling evidence that such levels of care are unwarranted.  *See, e.g.*, AACAP/AACP Child and Adolescent Level of Care Utilization System (CALOCUS), Part V ("Placement Methodology") ("In most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise.  This again will lead us to err on the side of caution and safety, rather than risk and instability.") (emphasis in original).

86.     In other words, the insurer must defer to the highest level of care appropriate, and there must be evidence that a level of care lower or less intensive than that prescribed by the treating professional is warranted.  This is the only way to put the patient's interest in recovery ahead of the insurer's interest in minimizing its expenses.  Were the balance reversed, insurers would deny valid substance abuse treatment claims by default, in the absence of compelling evidence that a prescribed level of care is proper.

87.     Defendants thwart generally accepted professional standards by reversing that balance and imposing upon the patient the burden of demonstrating that the treating professional's prescribed residential rehabilitation treatment program is appropriate and warranted.

88.     Indeed, Magellan makes no secret that its objective in designing and implementing the MNCGs is to approve only the "least-intensive" level of care (2015 MNCGs at iv), allowing it to shirk its duty to assure that the treatment approved is effective and consistent with prescribed care.

89.     The CALOCUS standard, developed by AACAP and AACP, expressly notes that "it may be desirable for a child or adolescent to remain at a higher level of care to preclude relapse and unnecessary disruption of care, and to promote lasting stability.  A child or adolescent may make the transition to another level of care when, ***after an adequate period of stabilization and based on the family's and treatment team's clinical judgment***, the child or adolescent meets the criteria for the other level of care."

90.     These generally accepted professional standards further support the conclusion that Defendants' decision to shift onto the patient the burden of proving the appropriateness of a treating professional's residential rehabilitation treatment program is fundamentally improper.

91.     Next, condition I.D(2) deviates from ASAM standards by conditioning residential treatment on a "*severely*" dysfunctional living environment.

92.     The ASAM standards call for inclusive consideration of a large variety of familial and environmental factors in assessing suitability of residential treatment, and do not

support application of a "severe" dysfunction requirement to merit residential rehabilitation treatment.

93.     The ASAM standards are not consistent with condition I.D(2), or the notion that care should be denied where a patient's living environment is demonstrably "dysfunctional" but not "severely dysfunctional."   The MNCGs' use of "severely dysfunctional" renders them overly restrictive and non-inclusive, contrary to ASAM standards.

94.     Finally, condition III.B requires patients' treatment plans to "bring about **significant** improvement" in the patient's substance abuse disorder.   This is inconsistent with generally accepted professional standards, including standards promulgated by ASAM, AACP, and other authorities.

95.     For instance, AACP states that intensive outpatient treatment should be considered medically necessary if the intervention would cause any *one* of the following results:  (a) prevent deterioration; (b) alleviate symptoms; (c) improve level of functioning; or (d) assist in restoring normal development in a child.

96.     Likewise, the Centers for Medicare & Medicaid Services has indicated that even for inpatient psychiatric hospital services, providers are only required to show that the treatment would "reasonably [be] expected to improve the patient's condition . . . ."

97.     The generally accepted criterion of *reasonable* improvement—which may include prevention of deterioration rather than specific forms or measurements of progression—is a far cry from Magellan's overly-restrictive *significant* improvement condition.

**B.     INTENSIVE OUTPATIENT TREATMENT CONDITIONS**

98.     The MNCGs define intensive outpatient programs as programs with "the capacity for planned, structured, service provision of at least 2 hours per day and 3 days per week, although some patients may need to attend less often.   These encounters are usually comprised of coordinated and integrated multidisciplinary services," including "group, individual, family or multi-family group psychotherapy, psychoeducational services, and adjunctive services such as medical monitoring."

99.    Magellan's 2015 MNCGs specify criteria that must be satisfied to merit continuing intensive outpatient treatment for substance abuse disorders in adults:

III.    Continued Stay

Criteria A, B, C, and D must be met to satisfy the criteria for continued stay.

A.    Despite reasonable therapeutic efforts, clinical evidence indicates at least one of the following:

1)    the persistence of problems that caused the admission to a degree that continues to meet the admission criteria (both severity of need and intensity of service needs), *or*

2)    the emergence of additional problems that meet the admission criteria (both severity of need and intensity of service needs), *or*

3)    that disposition planning and/or attempts at therapeutic re-entry into a less intensive level of care have resulted in, or would result in exacerbation of the substance-related disorder to the degree that would necessitate continued intensive outpatient treatment. Subjective opinions are NOT sufficient to meet severity of need. There must be objective clinical evidence or objective information to justify the expectation that there would be a decompensation.

B.    **The current or revised treatment plan can be reasonably expected to bring about significant improvement in the presenting or newly defined problem(s) meeting criterion IIIA**, and this is documented by progress notes for each day the patient attends the intensive outpatient program, written and signed by the provider.

C.    **The patient has the capability of developing skills to manage symptoms or make behavioral change and demonstrates motivation for change,** as evidenced by attending treatment sessions, completing therapeutic tasks, and adhering to a medication regimen or other requirement of treatment.

D.    All applicable elements in Admission Intensity and Quality of Service criteria are applied as related to assessment and treatment, if clinically relevant and appropriate.

100.    Although Magellan states that these criteria reflect merely "a more detailed elaboration" of the definition of "medical necessity," they are substantially more restrictive than generally accepted professional standards.

101.    Condition III.B requires patients' treatment plans to "bring about **significant** improvement" in the patient's substance abuse disorder.  This is inconsistent with generally accepted professional standards, including standards promulgated by ASAM, AACP, and other authorities.

102.    For instance, AACP states that intensive outpatient treatment should be considered medically necessary if the intervention would cause any *one* of the following results:  (a) prevent deterioration; (b) alleviate symptoms; (c) improve level of functioning; or (d) assist in restoring normal development in a child.

103.    Likewise, the Centers for Medicare & Medicaid Services has indicated that even for inpatient psychiatric hospital services, providers are only required to show that the treatment would "reasonably [be] expected to improve the patient's condition . . . ."

104.    The generally accepted criterion of *reasonable* improvement—which may include prevention of deterioration rather than specific forms or measurements of progression—is a far cry from Magellan's overly restrictive *significant* improvement condition.

105.    Finally, condition III.C is—like conditions I.F and III.D in the residential rehabilitation context—overly restrictive and inconsistent with generally accepted professional standards.  That condition requires demonstrable motivation for change, when, as shown above, lack of motivation for change is a well-known sign of the *need* for professional, medical intervention in substance abuse disorders.

106.    That Magellan's MNCGs are more restrictive than the Plans they purportedly serve, and more restrictive than generally accepted professional standards, is fully consistent with Magellan's dereliction of its duties to insureds.  As early as 2009, ASAM cautioned in its *Public Policy Statement on Managed Care, Addiction Medicine, and Parity* that when an insurer (or claims adjudicator working on behalf of an insurer) "develops its own addiction treatment level of care admission and continuing stay guidelines for authorizing or denying requested treatment rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

CLASS ACTION COMPLAINT

107.   This concern is well founded in this case.  By imposing and/or approving the imposition of unduly restrictive criteria for admission and continuing stay in residential rehabilitation and intensive outpatient treatment for substance abuse disorders in children and adolescents, Blue Shield and Magellan have put cost (and profit) considerations far above the wellbeing of their insureds.  In doing so, they have violated their fiduciary duties to Plaintiffs and the other members of the Class.

108.   Magellan's MNCGs concerning treatment of substance abuse disorders are substantially similar to the MNCGs concerning treatment of mental health disorders.  They suffer, therefore, from the same defects.  Defendants are thus liable for the development and use of MNCGs in the denial of mental health claims to the same extent as they are for the use of the guidelines in the case of substance abuse disorders.

109.   Because Magellan's MNCGs contravene terms of the plan documents themselves, and have no basis in generally accepted professional standards, they generate results that are unpredictable, arbitrary, and untethered to any plan requirements.  The threshold question of whether care meets generally accepted standards is a necessary condition for a finding of medical necessity, but the guidelines used to make that determination have no basis in the governing Plan documents.  When beneficiaries' coverage determinations, therefore, are "correct" (i.e., consistent with what the Plan terms actually provide for), it is only by chance.  Thus, by applying these guidelines, Magellan is essentially rolling a loaded dice as to whether beneficiaries receive coverage for the care they are due.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTY AND
## IMPROPER DENIAL OF R.D.'S CLAIMS

110.    Charles Des Roches is a Blue Shield PPO subscriber residing in Salinas, California.  Charles Des Roches shares joint custody of R.D., a minor, with R.D.'s mother.

111.    R.D. is a beneficiary of Charles Des Roches's Blue Shield PPO plan (the "Des Roches Plan"), a non-grandfathered, large group plan that is fully insured by Blue Shield with an effective date of October 1, 2014.  The Des Roches Plan renews annually.

112.    According to the Evidence of Coverage ("EOC") that governs the Des Roches Plan, all mental health services are "provided through the Plan's Mental Health Service Administrator (MHSA)."   The EOC also provides that "[n]o benefits are provided for Substance Abuse Conditions, unless substance abuse coverage is provided as an optional Benefit by your Employer."  The Des Roches Plan includes substance abuse coverage.

113.    With respect to mental health and substance abuse benefits, the EOC states, "Blue Shield's Mental Health Service Administrator (MHSA) arranges and administers Mental Health Services for Blue Shield Members within California."

114.    As alleged above, the MHSA to which the EOC refers is Magellan.

115.    Accordingly, Blue Shield has delegated responsibility for administering mental health and substance abuse benefits, and adjudicating mental health and substance abuse claims, to Magellan.

116.    The EOC further provides that, "[t]he Benefits of this Plan are intended only for Services that are Medically Necessary.  Because a Physician or other provider may prescribe, order, recommend, or approve a service or supply does not, in itself, make it medically necessary even though it is not specifically listed as an exclusion or limitation. … Blue Shield of California may limit or exclude benefits for services which are not necessary."

117.    The EOC defines Medical Necessity in the following manner: "Services which are medically necessary include only those which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by Blue Shield, are: a. consistent with Blue Shield of

23

California medical policy; b. consistent with the symptoms or diagnosis; c. not furnished primarily for the convenience of the patient, the attending Physician or other provider; and d. furnished at the most appropriate level which can be provided safely and effectively to the patient."

118.    The EOC does not condition delivery of medically necessary treatment to the "least-intensive" level of care, as do Magellan's MNCGs.

119.    Nor does the EOC allow Blue Shield or Magellan to deviate from generally accepted professional standards in approving coverage of care.

120.    The EOC also sets forth a grievance and appeal process for mental health and substance abuse claims.  This process allows subscribers (or their representatives or providers) to submit requests for review of initial claims determinations by phone, letter, or online, or to submit a Grievance Form by mail or online.  The EOC requires grievances to be submitted within 180 days following the incident complained of, and resolved within 30 days.

121.    On August 26, 2015, R.D.—then fifteen years old—was urgently admitted for residential rehabilitation treatment at Evolve Treatment Center in Topanga Canyon, California, due to substance abuse, major depression, and severe emotional disturbance of a child.

122.    For the preceding two years, R.D. had abused cannabis, alcohol, hallucinogens, cough syrup, painkillers, and nitrous oxide.  R.D. has a documented history of shoplifting and theft, including breaking into cars to steal money for drugs, and of excessive anxiety, aggression, and anger, including punching a hole in a parent's wall and breaking his hand as a result.  R.D.'s divorced parents have joint custody of R.D., and R.D. sleeps an average of 12 hours per day, exhibiting a general disinterestedness in normal activities and a lack of motivation, as well as fluctuations in weight.  R.D. had undergone multiple outpatient treatments, including psychopharmacological treatment (Zoloft and Wellbutrin for over a year), psychotherapy, and EMDR, prior to admission at Evolve Treatment Center.

123.    R.D.'s parents are unable to present a unified parenting front, as evidenced in R.D.'s clinical records, and neither can effectively supervise or support R.D. on an outpatient basis, or contain R.D. in their homes.

124.    On August 28, 2015, Blue Shield issued a letter denying coverage for R.D.'s residential rehabilitation treatment based on Magellan's adjudication of the claim (the "Denial Letter").

125.    The Denial Letter states that "residential substance use rehabilitation treatment is not medically necessary based on 2015 Magellan Medical Necessity Criteria Guidelines, as adopted by Blue Shield of California MHSA, Residential Treatment Substance Use Disorders, Rehabilitation, Child and Adolescent, I-C and I-D," and enumerates the following as "reasons" for the denial:

> Your substance use/dependency has not caused significant impairment that cannot be managed at a lower level of care.  You have not had recent, appropriate professional intervention at a less intensive level of care.  Your living situation does not undermine treatment, or alternative living situations are appropriate.  There is no evidence for serious, imminent danger outside residential treatment.  There is no clinical evidence that you are unlikely to respond to treatment at a less intensive and less restrictive level of care.

126.    Instead of approving the residential rehabilitation treatment R.D. required, as prescribed by R.D.'s treating provider, Defendants instructed R.D. to "actively participate in self-help groups and to make use of community resources for substance use recovery."

127.    R.D. appealed Defendants' August 28, 2015 denial on August 31, 2015.

128.    On September 3, 2015, Defendants denied the appeal by letter (the "Appeal Denial Letter").  Defendants explained that:

> The principal reason [for denial] is that the medical necessity of treatment at a residential level of care was not established.  A review of your medical records submitted to Blue Shield indicates that on August 25, 2015, you did not meet the Blue Shield of California / Magellan guidelines for treatment at a residential program since:
>
> - Your doctor has not shown that you can benefit from residential rehabilitation treatment
>
> - Your substance use/dependency has not caused significant impairment that cannot be managed at a lower level of care
>
> - You have not had recent, professional outpatient intervention

- Your living situation does not undermine treatment, or alternative living situations are appropriate

- There is no evidence for serious, imminent danger outside of residential treatment

- Based on the information from your provider, you can be safely treated at a lower level of care such as Intensive Outpatient Psychiatric (IOP) chemical dependency and mental health treatment level of care.

129. The Appeal Denial Letter continued, "In addition, your appeal has been reviewed by a psychiatrist who agrees that care in a residential care program from August 25, 2015, going forward is not medically necessary."

130. R.D. submitted extensive clinical records substantiating R.D.'s need for residential rehabilitation treatment to the persons responsible for conducting appeal.

131. Defendants based their denials of coverage on criteria inconsistent with generally accepted professional standards.

132. In particular, Defendants rejected R.D.'s claim because:

    a.  R.D. did not show that he "failed first" at a lower level of care, despite that this generally accepted professional standards reject "fail first" criteria;

    b.  R.D. was purportedly not in danger or a risk to others—although this standard is typically associated with criteria for hospitalization;

    c.  R.D.'s living situation was purportedly adequately supportive—although, as noted above, R.D.'s divorced parents are unable to effectively supervise or support R.D. on an outpatient basis, or contain R.D. in their homes;

    d.  R.D. purportedly failed to show that R.D. could not benefit from a lower level of care—although, as noted above, generally accepted professional standards, including CALOCUS and LOCUS, require a "clear and compelling rationale" for selecting a lower level of care than that prescribed by a treating professional; and

    e.  R.D. purportedly failed to show that R.D. could benefit from residential care—although, again, generally accepted professional standards require a "clear and compelling rationale" for selecting a lower level of care than that prescribed by

26

a treating professional, and R.D.'s clinically documented lack of motivation may not properly be construed by Defendants as showing an incapacity to benefit from residential care, under generally accepted professional standards.

133.    Thus, Defendants ignored generally accepted professional standards in applying Magellan's overly restrictive MNCGs in adjudicating and denying R.D.'s claim for residential rehabilitation treatment.

134.    Accordingly, R.D. exhausted all internal administrative remedies. However, administrative exhaustion is not a prerequisite for a breach of fiduciary duty claim.

135.    R.D. received the necessary residential rehabilitation treatment from August 26, 2015, to October 25, 2015, and consequently incurred tens of thousands of dollars of unreimbursed expenses. In light of R.D.'s severe substance abuse disorder and co-morbid mental health conditions, it is expected that R.D. will require such treatment again in the future. Indeed, following treatment at Evolve Treatment Center, R.D. was transported directly to a secured therapeutic boarding school staffed by licensed psychologists, a psychiatrist, and medical doctors.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTY AND IMPROPER DENIAL OF D.V.'S CLAIMS

136.    Sylvia Meyer is a Blue Shield PPO subscriber residing in Los Angeles County, California. D.V. is Sylvia Meyer's son.

137.    D.V. is a beneficiary of Sylvia Meyer's Blue Shield PPO plan (the "Meyer Plan"), a non-grandfathered, large group plan that is fully insured by Blue Shield. The Meyer Plan renews annually.

138.    As with the Des Roches Plan, the Meyer Plan EOC provides that all mental health services are "provided through the Plan's Mental Health Service Administrator (MHSA)."

139.    The EOC also provides that "[n]o benefits are provided for Substance Abuse Conditions, unless substance abuse coverage is provided as an optional Benefit by your Employer." The Meyer Plan includes substance abuse coverage.

140.    With respect to mental health and substance abuse benefits, the EOC states that "Blue Shield has contracted with the Plan's MHSA [which] . . . will underwrite and deliver Blue Shield's Mental Health Services . . . ."

141.    As alleged above, the MHSA to which the EOC refers is Magellan.

142.    Accordingly, with respect to the Meyer Plan as well as the Des Roches Plan, Blue Shield has delegated responsibility for administering mental health and substance abuse benefits, and adjudicating mental health and substance abuse claims, to Magellan.

143.    The EOC further provides that, "[t]he Benefits of this Plan are intended only for Services that are Medically Necessary.  Because a Physician or other provider may prescribe, order, recommend, or approve a service or supply does not, in itself, make it medically necessary even though it is not specifically listed as an exclusion or limitation. . . . . Blue Shield of California may limit or exclude benefits for services which are not necessary."

144.    The EOC for the Meyer Plan, like the Des Roches Plan, defines Medical Necessity as follows:  "Services which are medically necessary include only those which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by Blue Shield, are: a. consistent with Blue Shield of California medical policy; b. consistent with the symptoms or diagnosis; c. not furnished primarily for the convenience of the patient, the attending Physician or other provider; and d. furnished at the most appropriate level which can be provided safely and effectively to the patient."

145.    The Meyer Plan's EOC does not condition the delivery of medically necessary treatment to the provision of the "least-intensive" level of care, yet Magellan's MNCG do.

146.    Nor does the EOC allow Blue Shield or Magellan to deviate from generally accepted professional standards in approving care.

147.    The Meyer Plan provides for the same internal appeals process as the Des Roches Plan.

148.    On July 6, 2015, D.V. was admitted to an intensive outpatient psychiatric program at Evolve Treatment Center.

149.    For more than four years before his admission, D.V. suffered from major depression, which was compounded by abuse of alcohol as well as cocaine, marijuana, benzodiazepine (i.e., "benzos") and other drugs.  D.V. had been involved in criminal activity and was suspended from school for fighting with a classmate.

150.    D.V.'s parents are divorced.  His father abuses marijuana and pain pills, as well as alcohol, and had attempted suicide in the past.  Two of his paternal aunts died of drug overdoses.  D.V. had an unstable childhood, with widespread interfamily conflict.  He has a strained relationship with his mother and no relationship with his older brother.  D.V. had undergone psychiatric treatment at UCLA, residential care, and partial hospitalization.

151.    After treatment in residential care and in partial hospitalization, D.V. was admitted to an intensive outpatient psychiatric level of care at Evolve Treatment Center on July 6, 2015.

152.    On August 11, 2015, Sylvia Meyer and D.V. received a letter from Blue Shield denying coverage for D.V.'s intensive outpatient treatment from August 7, 2015, going forward (the "D.V. Denial Letter").

153.    The D.V. Denial Letter states that "intensive outpatient substance abuse treatment is not medically necessary based on 2015 Magellan Medical Necessity Criteria Guidelines, as adopted by Blue Shield of California MHSA, Intensive Outpatient Treatment, Substance Abuse Disorders, Rehabilitation, Adult and Geriatric, IID, IIIB, IIIC, IIID" and enumerates the following as "reasons" for the denial:

> Your treatment plan does not consider the use of medications to help with cravings and relapse prevention.  Your provider has not shown that the treatment plan will bring about further significant improvement in the problems that required an intensive outpatient treatment program.  Your provider has not shown that you have the motivation, and the ability, to follow your treatment plan.  Outpatient psychiatric and substance use rehabilitation treatment should be considered.   Your provider has not shown that your treatment plan meets the expectations for intensity and quality of service for this level of care.

154.    Instead of approving the intensive outpatient psychiatric treatment D.V. required, as prescribed by D.V.'s treating provider, Defendants instructed D.V. "to participate in self-help groups and to make use of community resources."

155.    On August 21, 2015, the denial was appealed.

156.    On September 15, 2015, Defendants denied the appeal by letter (the "D.V. Appeal Denial Letter").

157.    Defendants explained that:

> The principal reason [for denial] is that the medical necessity of treatment at an intensive outpatient program level of care was not established.  As of August 7, 2015, you did not meet the Blue Shield of California / Magellan guidelines to be at an intensive outpatient psychiatric (IOP) level of care since:
>
> - You have improved and no longer require a structured intensive outpatient treatment setting for care
>
> - Your provider has not shown that the treatment plan will bring about significant further improvement in the problems that required an intensive outpatient treatment program
>
> - The medical necessity criteria appear to be met for outpatient psychiatric and substance use treatment, which is available to you
>
> - A short period of traditional outpatient treatment could help you solidify and maintain your abstinence and recovery
>
> - You are also encouraged to participate in both individual and family psychotherapies as well as in self-help groups and to make use of community resources.

158.    The D.V. Appeal Denial Letter continued, "In addition, your appeal has been reviewed by a psychiatrist who agrees that continued care at an intensive outpatient program level of care was not medically necessary as of August 7, 2015."

159.    Defendants based their denials of coverage on criteria inconsistent with generally accepted professional standards.  In particular, Defendants rejected D.V.'s claim because:

CLASS ACTION COMPLAINT

a.  D.V. purportedly failed to show that D.V. could not benefit from a lower level of care (i.e., "traditional outpatient treatment")—although, as noted above, generally accepted professional standards, including CALOCUS and LOCUS, require a "clear and compelling rationale" for selecting a lower level of care than that prescribed by a treating professional;

b.  D.V. purportedly failed to show that D.V. would obtain "significant further improvement" from intensive outpatient psychiatric care—although, again, generally accepted professional standards do not require a showing of "significant" improvement; and

c.  D.V. purportedly failed to show that he was motivated for treatment, although generally accepted professional standards recognize that lack of motivation warrants care.

160.   Thus, Defendants ignored generally accepted professional standards in applying Magellan's overly restrictive MNCGs in adjudicating and denying D.V.'s claim for intensive outpatient treatment.

161.   Accordingly, D.V. exhausted all internal administrative remedies.  However, administrative exhaustion is not a prerequisite for a breach of fiduciary duty claim.

162.   D.V. received the prescribed intensive outpatient psychiatric treatment from August 7, 2015, to September 4, 2015, and consequently incurred significant in unreimbursed expenses.  In light of D.V.'s severe substance abuse disorder and co-morbid mental health conditions, it is expected that D.V. may require such treatment again in the future.

## CLASS ACTION ALLEGATIONS

163.   Plaintiffs incorporate by reference the preceding paragraphs as though set forth fully herein.

164.   Blue Shield and Magellan serve as the claims administrators for mental health and substance abuse treatment claims for other health insurance plans that define covered treatment in the same way as the Plaintiffs' Plans.

165.    The policies and practices that Defendants followed with respect to the claims filed by Plaintiffs are the same as those that have been applied by Defendants to other similarly-situated insureds seeking mental health and substance abuse treatment benefits under their health plans.

166.    As such, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring their claims on behalf of themselves and a putative class of similarly situated individuals as noted in the counts below.

167.    The class ("Class") is defined as follows:

> All participants or beneficiaries in an insurance plan governed by ERISA, for which Blue Shield and/or Magellan make coverage decisions with respect to claims for mental health and substance abuse-related treatment, who sought and were denied coverage for all or a portion of residential treatment for mental health or substance use disorders, or intensive outpatient treatment for mental health or substance use disorders, within the applicable statute of limitations.

168.    There are so many persons within the putative Class that joinder is impracticable.

169.    Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of the Class.  Such common questions of law and fact include, but are not limited to, the following:

    a.  The nature of the legal duties ERISA imposes upon Blue Shield and/or Magellan as claims administrators for mental health and substance abuse claims;

    b.  Whether Magellan engages in a fiduciary act when it develops and utilizes mental health and substance abuse MNCGs;

    c.  Whether Blue Shield engages in a fiduciary act when it adopts and approves Magellan's mental health and substance abuse level-of-care and coverage determination guidelines;

    d.  Whether Magellan's MNCGs are consistent with generally accepted professional standards in the mental health and substance abuse disorder treatment community;

e.  Whether Blue Shield's adoption and approval, and/or Magellan's development and utilization, of the MNCGs constitutes a breach of fiduciary duty;

f.  Whether Magellan engages in a fiduciary act when it adjudicates a claim for benefits pursuant to delegation by Blue Shield;

g.  Whether Blue Shield engages in a fiduciary act when it approves or ratifies Magellan's adjudication of a claim for benefits;

h.  What remedies are available if any or all Defendants are found liable for the claims asserted.

170.  Certification is desirable and proper because Plaintiffs' claims are typical of the claims of members of the proposed Class that Plaintiffs seek to represent.

171.  Certification is also desirable and proper because Plaintiffs will fairly and adequately protect the interests of the Class members that they seek to represent.  There are no conflicts of interest between Plaintiffs and members of the Class, and Plaintiffs are cognizant of their duties and responsibilities to the entire Class.  Plaintiffs' counsel are qualified, experienced, and able to conduct the proposed class action litigation.

172.  It is desirable to concentrate the litigation of these claims in this forum.  The determination of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues presented in this litigation.

173.  Any difficulties likely to be encountered in maintaining this action as a class action are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to Class members through numerous individual actions.  The burden individual litigation would impose on the courts, moreover, is avoidable by means of the class action mechanism.

## CAUSES OF ACTION

### COUNT I

### BREACH OF FIDUCIARY DUTIES UNDER 29 U.S.C. § 1132(a)(1)(B)

174.  Plaintiffs incorporate by reference the preceding paragraphs as though set forth fully herein.

175.   Plaintiffs bring this cause of action individually and on behalf of the Class.

176.   This cause of action is brought pursuant to 29 U.S.C. § 1132(a)(1)(B) to clarify Plaintiffs' and Class members' rights to future benefits and enforce their rights under their Plans, as a result of Defendants' development, adoption, approval, ratification, and utilization of medical necessity criteria and claims determination guidelines that are far more restrictive than those that are generally accepted in contravention of their ERISA fiduciary obligations under ERISA.

177.   As the entities responsible for making and/or approving mental health and substance abuse benefit determinations under the Plans, and responsible for developing and/or approving internal practices and policies to facilitate such determinations, Defendants are ERISA fiduciaries.

178.   As ERISA fiduciaries, and pursuant to 29 U.S.C. § 1104(a), Defendants are required to discharge their duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries, and to pay reasonable expenses of administering the Plans.  They must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans they administer. They must conform their conduct to a fiduciary duty of loyalty and may not make misrepresentations to their insureds.

179.   Defendants violated, and continue to violate, these duties by developing, adopting, approving, ratifying, and utilizing the restrictive level-of-care and coverage determination guidelines discussed hereinabove, and in applying them to claims submitted by Plaintiffs and the other Class members.  Despite the fact that the insurance plans that insure Plaintiffs and the other Class members provide for insurance coverage for residential rehabilitation and intensive outpatient treatment for substance abuse disorders, the fact that generally accepted professional standards of care are widely available and well-known to Defendants, and the fact that Defendants asserted that their guidelines were consistent with those generally accepted standards, Defendants developed, adopted, approved, ratified, and utilized guidelines that are far more restrictive than those that are generally accepted.  In so

doing, Defendants did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." They did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. They did not act in accordance with the terms of Plaintiffs' Plans, nor with the terms of the other Class members' plans.

180.    Instead, Defendants elevated their own financial interests, and those of their corporate affiliates, above the interests of Plan participants and beneficiaries, including Plaintiffs and all other Class members. By promulgating improperly restrictive guidelines, Defendants artificially decreased the number and value of covered claims, thereby benefiting themselves and their affiliates at the direct expense of their insureds, including Plaintiffs.

181.    To remedy their injuries arising out of Defendants' breaches of fiduciary duty, Plaintiffs, individually and on behalf of the Class, request a judgment in their favor: (i) declaring that Magellan's internal guidelines complained of herein were developed and utilized in violation of Magellan's fiduciary duties; (ii) declaring that Blue Shield's approval, adoption and/or ratification of Magellan's internal guidelines complained of herein, and their utilization in claims adjudication, constitute a violation of Blue Shield's fiduciary duties; (iii) issue a permanent injunction ordering Defendants to cease utilization of the guidelines complained of herein, and instead adopt, develop, and utilize guidelines that are consistent with general accepted professional standards; and (iv) ordering Defendants to reprocess claims for residential rehabilitation treatment and intensive outpatient treatment for substance abuse and mental health disorders that they previously denied in whole or in part, pursuant to new guidelines that are consistent with generally accepted professional standards and the Class members' plans.

**COUNT II**

**IMPROPER DENIAL OF BENEFITS UNDER 29 U.S.C. § 1132(a)(1)(B)**

182.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

183.    Plaintiffs bring this cause of action individually and on behalf of the Class.

184.    This cause of action is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

185.   Defendants denied the insurance claims for residential rehabilitation treatment and intensive outpatient treatment for substance abuse disorders submitted by Plaintiffs (respectively, R.D. and D.V.) and other Class members in violation of the terms of Plaintiffs' Plans and the plans insuring other Class members.

186.   Plaintiffs and the other Class members have been harmed by Defendants' improper benefit denials because they were deprived of insurance benefits they were owed.

187.   To remedy these injuries, Plaintiffs, individually and on behalf of the Class, request a judgment in their favor ordering Defendants to reprocess claims for residential rehabilitation treatment and intensive outpatient treatment for substance abuse and mental health disorders that they previously denied in whole or in part, pursuant to new guidelines that are consistent with generally accepted professional standards and the Class members' plans.

**COUNT III**

**INJUNCTIVE RELIEF UNDER 29 U.S.C. § 1132(a)(3)(A)**

188.   Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

189.   Plaintiffs bring this cause of action individually and on behalf of the Class.

190.   Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by Defendants' breaches of fiduciary duty described hereinabove.

191.   To remedy these injuries, Plaintiffs and the Class are entitled to seek, and do seek, an injunction prohibiting these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A), and seek a judgment in their favor ordering Defendants to reprocess claims for residential rehabilitation treatment and intensive outpatient treatment for substance abuse and mental health disorders that they previously denied in whole or in part, pursuant to new guidelines that are consistent with generally accepted professional standards and the Class members' plans.

**COUNT IV**

**OTHER APPROPRIATE EQUITABLE RELIEF UNDER 29 U.S.C. § 1132(a)(3)(B)**

192.   Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

CLASS ACTION COMPLAINT

193.   Plaintiffs bring this cause of action individually and on behalf of the Class.

194.   This cause of action is brought pursuant to 29 U.S.C. § 1132(a)(3)(B).

195.   Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by Defendants' breaches of fiduciary duty described hereinabove.

196.   Additionally, by engaging in this misconduct, including denying Plaintiffs' claims, Defendants caused themselves and their corporate affiliates to be unjustly enriched as they were not required to pay benefit claims.

197.   To remedy these injuries, Plaintiffs and the Class are entitled to seek, and do seek, appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B), and they seek a judgment in their favor (i) ordering Defendants to reprocess claims for residential rehabilitation treatment and intensive outpatient treatment for substance abuse and mental health disorders that they previously denied in whole or in part, pursuant to new guidelines that are consistent with generally accepted professional standards and the Class members' plans; and (ii) ordering Defendants to pay a surcharge or other make-whole relief to Plaintiffs and the other Class members in an amount equivalent to the revenue Defendants generated for providing mental health and substance abuse-related claims administration services with respect to claims filed by Plaintiffs and the other Class members, expenses that Defendants and their corporate affiliates avoided due to their wrongful denials, the additional revenue Defendants received as a result of those cost-avoidances, the out-of-pocket costs that Plaintiffs and other Class members incurred following Defendants' wrongful denials, and/or pre-judgment interest.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand judgment in their favor against Defendants providing the relief requested in Counts I-IV above and providing the additional relief as follows:

198.   Certifying the Class and all causes of action asserted herein for class treatment under Federal Rule of Civil Procedure 23;

199.   Appointing Plaintiffs as Class Representatives;

CLASS ACTION COMPLAINT

1    200.    Appointing Plaintiffs' counsel (Grant & Eisenhofer P.A., Zuckerman Spaeder

2  LLP, and Psych-Appeal, Inc.) as counsel for the Class;

3    201.    Awarding Plaintiffs disbursements and expenses for this action, including

4  reasonable attorneys' fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. §

5  1132(g); and

6    202.    Granting such other and further relief as is just and proper.

7

8  Dated: May 26, 2016                    Respectfully submitted,

9                                          /s/ *Rebecca A. Musarra*

10                                         Meiram Bendat (Cal. Bar No. 198884)
                                           PSYCH-APPEAL, INC.
11                                         8560 West Sunset Boulevard, Suite 500
                                           West Hollywood, California  90069
12                                         Tel: (310) 598-3690, x. 101
                                           Fax: (310) 564-0040
13                                         mbendat@psych-appeal.com

14                                         Daniel L. Berger (to be admitted *pro hac vice*)
15                                         Kyle J. McGee (to be admitted *pro hac vice*)
                                           Rebecca A. Musarra (Cal. Bar No. 291250)
16                                         GRANT & EISENHOFER P.A.
                                           485 Lexington Avenue
17                                         New York, New York  10017
                                           Tel: (646) 722-8500
18                                         Fax: (646) 722-8501
19                                         dberger@gelaw.com
                                           kmcgee@gelaw.com
20                                         rmusarra@gelaw.com

21                                         Jason S. Cowart (to be admitted *pro hac vice*)
22                                         ZUCKERMAN SPAEDER LLP
                                           1185 Avenue of the Americas, 31st Floor
23                                         New York, New York  10036
                                           Tel: (212) 704-9600
24                                         Fax: (212) 704-4256
                                           jcowart@zuckerman.com
25

26                                         *Attorneys for Plaintiffs and the Proposed Class*

27

28